**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENSION FUND FOR HOSPITAL AND | : | |
| HEALTH CARE EMPLOYEES - | : | Civil Action No. _____ |
| PHILADELPHIA AND VICINITY; and HENRY | : | |
| NICHOLAS, on behalf of themselves and all | : | |
| others similarly situated, | : | |
| | : | |
| Plaintiffs | : | **Class Action** |
| | : | |
| v. | : | |
| | : | |
| AUSTIN CAPITAL MANAGEMENT LTD., | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

Plaintiffs, Pension Fund for Hospital and Health Care Employees - Philadelphia and

Vicinity ("the Fund"), and Henry Nicholas, on behalf of themselves and the class of fiduciaries of

employee benefit funds as defined below, upon personal knowledge as to facts pertaining to

themselves, and upon information and belief and upon the investigation of their counsel as to all

other matters, allege as follows:

## INTRODUCTION

1.       This is a class action pursuant to the Employee Retirement Income Security Act,

*as amended*, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking equitable relief, including restitution,

for employee retirement benefit funds whose assets were lost by risky and imprudent investments

in the fraudulent investment schemes of Bernard L. Madoff, Bernard L. Madoff Investment

Securities, LLC ("Madoff Securities") and his investment funds.  Madoff is responsible for the

loss of as much as $50 billion through a giant Ponzi scheme in which early investors were paid

with the invested proceeds of later investors.

2.      Defendant Austin Capital Management Ltd. ("Austin") is a financial investment

management firm and is a fiduciary to many employee pension benefit plans like the Plaintiff

Fund who retained its services.  Austin directed significant amounts of investment, estimated at

present to be $184 million, into Madoff-related securities, virtually all of which were lost when

the Ponzi scheme became known in December 2008.

3.      Although Austin was a fiduciary to the Fund and had a duty to act prudently with

respect to any investment, it failed to adequately investigate, conduct a complete and proper due

diligence, and evaluate the evidence that any investment in Madoff-related securities would be

risky, imprudent and inappropriate.  Austin's lack of due diligence resulted in the failure to

discover or properly evaluate the numerous "red flags," including:

        a.      the lack of transparency in the operations of Madoff and Madoff-related

securities, including Madoff's refusal to disclose his investment strategy;

        b.      the fact that investment returns of Madoff Securities were abnormally

smooth, with very little volatility, including only five months of negative returns in the past 12

years;

        c.      the inability of other funds using a "split-strike conversion" strategy

(which Madoff asserted was his method) to generate returns in any way comparable to those

allegedly earned by Madoff and Madoff Securities;

        d.      the fact that Madoff acted as his own prime broker, while most hedge

funds used large banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

        e.      the fact that Madoff Securities generated revenue only through transaction-

based commission fees, whereas most hedge funds charge investment management fees based on

the fund's performance;

   f. monthly account statements sent to Madoff investors did not support the returns supposedly being earned;

   g. despite the size and scale of the Madoff Securities, its auditors, Friehling & Horowitz, consisted of one office in Rockland County, New York, with three employees: one was 78 years old and lived in Florida, and one was a secretary;

   h. Madoff Securities' comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers; and

   i. in 1999 and again in 2005, one of Madoff's competitiors, Harry Markopolos, wrote to the SEC describing how the claims of Madoff Securities were impossible and that the Madoff fund was in fact a fraudulent Ponzi scheme.

   4. Notwithstanding all the red flags, Austin continued to recommend and invest hundreds of millions of dollars in Madoff-related funds on behalf of Plaintiffs ans the members of the Class, in violation of its fiduciary duties.  As a result, Plaintiffs and the members of the Class suffered millions in losses.

## JURISDICTION AND VENUE

   5. This matter arises under Sections 409 and 502(a)(2) & (3) of the Employee Retirement Income Security Act ("ERISA"), *as amended*, 29 U.S.C. § 1109, 1132(a)(2) & (3). This Court has subject matter jurisdiction pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e), and 28 U.S.C. §§ 1331 and 1337.

   6. Venue is appropriate in this Court pursuant to 29 U.S.C. § 1132(e)(2), since the Fund is administered in this District; and the Defendant does substantial business in this District.

## PARTIES

7.  Plaintiff Pension Fund for Hospital and Health Care Employees - Philadelphia and

Vicinity ("the Fund") is a voluntary trust and an employee pension benefit plan within the

meaning of ERISA.  The Fund's principal offices are at 1319 Locust Street, Philadelphia,

Pennsylvania 19107.  The Fund provides defined benefit pensions to approximately 10,468

participants and beneficiaries located in Eastern Pennsylvania and in New Jersey.  As of

December 31, 2008, the Fund held approximately $295 million in assets.  The trustees of the

Fund, acting as fiduciaries of the Fund, have authorized this suit.

8.  Plaintiff Henry Nicholas is an adult resident of Philadelphia, Pennsylvania.  He is

the President of District 1199C, National Union of Hospital and Health Care Employees,

AFSCME, AFL-CIO ("District 1199C"), and a trustee of the Fund.  He brings this action in his

own name and as a Fund fiduciary.

9.  Defendant Austin Capital Management, Ltd. ("Austin") is a Texas limited

partnership with its principal offices at 5000 Plaza on the Lake, Suite 250, Austin, Texas 78746.

Austin describes itself as "a hedge fund of funds management firm."  The sole general partner in

Austin is Austin Capital Management GP Corp. ("ACM-GP"), a Texas corporation.  Both Austin

and ACM-GP are wholly owned subsidiaries of KeyCorp, an Ohio corporation.

## FACTUAL ALLEGATIONS

### A.    The Madoff Scheme

10.  Bernard L. Madoff is the founder and majority shareholder of Bernard L. Madoff

Investment Securities, LLC ("Madoff Securities").

11.  Madoff Securities is both a broker-dealer and investment advisor, registered with

the Securities and Exchange Commission ("SEC"), that engaged primarily in three distinct operations: (1) investment advisor services; (2) market making services; and (3) proprietary trading. According to its Form ADV filing with the SEC in January 2008, Madoff Securities had approximately $17 billion in assets under management.

12.     Madoff independently conducted his advisory service business apart from the Company's other services from a completely separate floor in Madoff Securities' New York offices. He kept the financial statements for the firm under lock and key and was reportedly "cryptic" about the advisory business when discussing it with other employees of Madoff Securities. In fact, it was through this investment advisory services business that Madoff conducted his massive Ponzi scheme.

13.     Madoff's client base was broad, ranging from large institutions to charitable foundations to high net worth individuals around the world. These investors were lured by Madoff's promise of a risk-reducing strategy that would generate returns consistently higher than those available through other investment vehicles.

14.     The capital that provided the fuel for Madoff's fraud was raised largely through "feeder funds," investment vehicles that acted as middle-men between Madoff Securities and investors. Many of these feeder funds were created by outside advisory firms that marketed the Madoff funds to high net-worth individuals and institutional investors. Other investors were brought in through funds of funds, such as Austin.

15.     For those who invested money with Madoff, either directly or indirectly through feeder funds, there were several key attractions. First, as the former Chairman of NASDAQ, Madoff had a stellar reputation in the investment community. He also gave the impression that

he was highly selective in accepting prospective investors, exuding an aura of exclusivity.

16.     More important to clients was his purported split-strike conversion strategy that was executed approximately 6-8 times per year at a cycle of 2-8 weeks.  The split-strike strategy involved purchasing a basket of stocks, then writing call options against those stocks, and, in turn, using the proceeds from writing the call options to purchase put options.  One of the "red flags" allegedly missed by investors and Madoff's auditors is that, while Madoff's strategy could reduce some volatility, it allegedly continued to gain in the declining stock market contrary to the strategy.  As a result, the returns of Madoff's strategy could not be replicated by quantitative analysis.

17.     Madoff claimed to use his split-strike conversion strategy which consistently produced "gains," even in declining markets.  As details of the fraud emerged, account statements issued to Madoff's clients were examined which notably revealed modest, but steady, gains each month regardless of market direction.

18.     What all of these investors later learned was that Madoff's "sophisticated" investment strategy was nothing more than a sham.  Incoming client money was often not invested at all, but was instead used to fund redemptions to existing clients.  It was, in short, a Ponzi scheme.

19.     In mid-December 2008, many of those invested with Madoff learned that their exceptional "returns" were, in fact, fictitious – concocted through the largest Ponzi scheme in financial history – and that collectively, investors may have lost $50 billion.

20.     Madoff's scheme worked well for many years, but when the credit crisis became acute in the fall of 2008, client redemptions grew exponentially.  By December, Madoff's Ponzi

scheme began to crack under its own weight.

21.     On December 9, 2008, Madoff advised a fellow senior employee that investors were seeking some $7 billion in redemptions for which Madoff was struggling to secure liquidity. The senior employee previously believed that Madoff's investment advisory service had somewhere in between $8-15 billion in assets under management. Madoff struggled to secure liquidity but, in the end, knew he could never match incoming client investments with the size of the requested redemptions.

22.     In a subsequent December 2008 meeting, Madoff informed his senior employees that his investment advisory service was "just one big lie" and "basically, a giant Ponzi scheme." He further advised that the company was insolvent and it had been for years. Nevertheless, having just admitted to $50 billion in lost assets, Madoff advised two of his senior employees that he intended to turn himself in to authorities in one week, but first had approximately $200-300 million remaining that he planned to distribute to select employees, family, and friends.

23.     On December 11, 2008, the SEC filed a civil action and request for emergency relief against Madoff and Madoff Securities to halt the ongoing fraudulent conduct. *SEC v. Madoff*, No. 08 Civ. 10791 (S.D.N.Y.).

24.     Also on December 11, 2008, Madoff was arrested by federal authorities for securities fraud pursuant to a criminal complaint.

25.     By order dated December 15, 2008, the Court appointed a trustee to preside over the liquidation of Madoff's business and stayed all further claims against Madoff Securities.

**B.      The Fund's Investments With Austin Capital Management**

26.     The Fund was created by District 1199C and various employers who have

collective bargaining agreements with District 1199C for the purpose of providing pension

benefits to vested bargaining unit members, primarily low-wage workers in the health care

industry.

27.     As an employee pension benefit fund, the Fund operates for the sole and exclusive

benefit of the participants and beneficiaries.  The Fund is a nonprofit institution.

28.     Since its inception in 1991, the Fund has retained Marco Consulting Group

("Marco") as its principal investment consultant.  Marco does not make the investment decisions

itself, but supervises numerous investment managers who manage different classes and

subclasses of investments on behalf of the Fund.

29.     In February 2008, the Fund's trustees authorized Marco to be the Fund's

investment fiduciary and to determine overall investment allocations on behalf of the Fund.

30.     In June 2008, after conducting a due diligence investigation, Marco retained

Austin for the purpose of managing a portion of the Fund's investment assets, to be invested in

hedge funds.  As of 2008, Austin had approximately $2.3 billion under management for all of its

clients.

31.     Austin is a fiduciary of the Fund within the meaning of Section 3(21) of ERISA,

29 U.S.C. § 1002(21), in that:

(a)     it exercises discretionary authority or control over a portion of the Fund

assets for the purpose of investment;

(b)     it is an investment manager within the meaning of Section 3(38) of

ERISA, 29 U.S.C. § 1002(38), which by definition is a fiduciary;

(c)     it executed an agreement with Marco expressly recognizing its status as a

-8-

fiduciary within the meaning of ERISA.

32.     As a fiduciary, Austin had a duty to prudently manage the Fund assets for the sole

and exclusive interest of the participants and beneficiaries, as set forth in Section 404(a) of

ERISA, 29 U.S.C. §1104(a).

33.     In July 2008, Marco placed $10,000,000 of Fund assets with Austin for

investment in Austin Capital Safe Harbor ERISA Dedicated Fund, Ltd. ("Austin Safe Harbor"),

an exempt corporation operating under the laws of the Cayman Islands.  Austin is the named

Investment Manager for Austin Safe Harbor.

34.     Austin invested a portion of the Austin Safe Harbor assets in Madoff-related

investments, specifically funds managed by Tremont Holdings.

35.     By letter dated December 12, 2008, the Fund was notified by Marco that the Fund

had exposure to Madoff through an investment in a fund of hedge funds managed by Austin.

36.     On December 16, 2008, Austin announced that it had invested a "limited amount

in a fund managed by Tremont Holdings, a registered investment advisor, which engaged the

firm controlled by Bernard L. Madoff."  *Austin American Statesman*, Dec. 17, 2008.  Austin

stated that it was "outraged" at Madoff's alleged conduct and "was taking every measure to

protect the interests of our investors. . . ."  *Id.*

37.     Austin also managed as much as $170 million for the Massachusetts Pension

Reserves Investment Management Board ("Massachusetts Pension Board"), of which $12 million

was exposed to Madoff-related investments.  *Austin American Statesman*, Dec. 17, 2008.  It also

invested approximately $170 million for the New Mexico Education Retirement Board, of which

approximately $8-10 million was in Madoff-related investments.  *Daily Times*, Dec. 19, 2008.

38.     On or about February 3, 2009, the Massachusetts Pension Board announced that it was withdrawing its assets from Austin's management.  *Austin Business Journal*, Feb. 3, 2009.

### C.     Austin's Failure to Exercise Due Diligence

39.     For years, there had been numerous warning signs that any investment in Madoff-related securities would be speculative and imprudent.  These included the signs discussed below.

#### 1.     The 1992 SEC Litigation

40.     In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns of 13.5 to 20 percent, and invested the money entirely with Madoff.  As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients.  No action was taken against Madoff.

#### 2.     The 1999 Markopolos Warnings

41.     In May 1999, Harry Markopolos, a derivatives expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.

#### 3.     The May 2001 *MAR/Hedge* Article

42.     In May 2001, the article "Madoff Tops Charts; Skeptics Ask How" appeared in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry.  In the article, author Michael Ocrant wrote:

a.      "Madoff has reported positive returns for the last 11-plus years in assets

managed on behalf of the feeder fund known as Fairfield Sentry.... [The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

        b.     "Those who question the consistency of the returns... include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."   These individuals "noted that others who use or have used the strategy... are known to have had nowhere near the same degree of success."

        c.     "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

        d.     "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals."

        e.     "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

        f.     "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"

        g.     "Madoff, who believes that he deserves 'some credibility as a trader for 40

years,' says: 'The strategy is the strategy and the returns are the returns.'  He suggests that those

who believe there is something more to it and are seeking an answer beyond that are wasting

their time."

### 4.    The May 2001 *Barron's* Article

43.    On May 27, 2001, *Barron's* - one of the country's leading financial publications -

published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his

investors to keep mum."  In that article, author Erin E. Arvedlund wrote:

a.    The private accounts managed by Madoff "have produced compound

average annual returns of 15% for more than a decade.  Remarkably, some of the larger, billion-

dollar Madoff-run funds have never had a down year.  When *Barron's* asked Madoff how he

accomplishes this, he says, 'It's a proprietary strategy.  I can't go into it in great detail.'  Nor

were the firms that market Madoff's funds forthcoming."

b.    "Still, some on Wall Street remain skeptical about how Madoff achieves

such stunning double-digit returns using options alone.  Three options strategists for major

investment banks told *Barron's* they couldn't understand how Madoff churns out such numbers

using this strategy."

c.    "Adding further mystery to Madoff's motives is the fact that he charges no

fees for his money management services."

d.    "The lessons of Long-Term Capital Management's collapse are that

investors need, or should want, transparency in their money manager's investment strategy.  But

Madoff's investors rave about his performance - even thought they don't understand how he does

it.  'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor

told Barron's.  'People who have all the trade confirms and statements still can't define it very well.' ...  This investor declined to be quoted by name.  Why?  Because Madoff politely requests that his investors not reveal that he runs their money."

       e.     "What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

### 5.      The 2005 Markopolos Warning

44.    On November 7, 2005, Markopolos submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he sets forth in detail, over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real.  Markopolos identified 29 red flags that were signs of high suspicious activity in Madoff Securities, including, among others:

       a.     *'why would B[ernie] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?"*  (emphasis in original).

       b.     "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature...  ***Why the need for such secrecy?*** *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry*

*rankings."* (emphasis in original).

    c.  "*It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! ... However, BM's performance numbers show only 7 extremely small [monthly] losses during 14½ years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!*" (emphasis in original).

    d.  "*Madoff does not allow outside performance audits.*" (emphasis in original).

    e.  *"Madoff returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."* (emphasis in original).

    f.  "*Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge funds, fund of funds to pocket their 1% and 20% fee bases [sic] upon Bernie Madoff's hard work and brains? Does this make any sense at all? Typically FOF's [fund of funds] charge only 1% and 10%, yet BM allows them the extra 10%. Why? And why do these third parties fail to mention Bernie Madoff in their marketing literature? After all he's the manager, don't investors have a right to know who's managing their money?*" (emphasis in original).

    g.  "*BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM. This allows for 'cleaner financial statements' according to this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud.*"

(emphasis in original).

       h.     Markopolos identified Tremont as one of the four largest feeder funds investing in Madoff.

### 6.    The 2007 Aksia Investigation

45.    In 2007, hedge fund investment adviser Aksia LLC urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

       a.     Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

       b.     Madoff's auditor, Friehling & Horowitz, operated out of a 13x18-foot location in New York, New York, and included one partner in his late 70s who lived in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big 3 accounting firm.  Friehling & Horowitz is now under investigation by the district attorney of Rockland County, New York.

46.    Aksia discovered the 2005 letter from Markopolos to the SEC described above.

47.    Aksia prepared its client advisory after, among other things, reviewing the stock holdings of Madoff Securities that were reported in quarterly statements filed with the SEC. Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing.  The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

### 7.    Other Red Flags

48.     In addition, investment advisors who thoroughly looked into Madoff's trading were unable to reconcile investors' account statements with the reported returns.  In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

49.     Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he managed.  A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vets hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets...  There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously unusual in that this is not a structure I've seen."

50.     *Pensions & Investments* magazine quoted a CEO of one large fund-of-funds as saying of Madoff, "There were a thousand red flags, if you did the work.  It didn't take much energy to reverse-engineer Madoff's track record and find that his split-strike conversion method just would not have worked in certain markets the way he said it did."  *P.I.* online, Dec. 22, 2008. Another executive said, "Among serious people in the industry, Madoff was a joke."  *Id.*

51.     Jim Vos, the CEO of Aksia Ltd., commenting on his company's decision not to recommend Madoff-related investments, stated, "[T]here were a host of red flags, which taken

together made us concerned about the safety of client assets should they [be] invested in these feeders. Consequently, every time we were asked by clients, we waved them away from the Madoff feeder funds." *Pensions & Investments*, Dec. 22, 2008.

52.     Notwithstanding all of the above warning and danger signs, Austin invested approximately $700,000 of the Fund's assets in Tremont Holdings, a feeder fund which in turn was completely invested in Madoff-related securities.

53.     Had Defendant conducted due diligence into Madoff and Madoff Securities, it would have discovered at least some of the numerous red flags identified herein. At the very least, like Aksia, Defendant should have been able to discover the existence of Markopolos' letter and the May 2001 article in *Barron's*, which would put them on notice of the numerous red flags identified therein.

54.     Even if Defendant did not uncover actual fraud, it should have concluded from the available evidence that investments in Madoff-related securities were inconsistent with the high duty of prudence required of fiduciaries and investment managers under ERISA.

55.     As a direct and proximate result of Defendant's failure to adequately investigate the Madoff-related securities before investing, Plaintiffs and the Class lost assets that were to be used for the sole and exclusive purpose of providing pension benefits to plan participants and beneficiaries.

## CLASS ALLEGATIONS

56.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (2), on behalf of itself and the following Class:

All employee benefit funds, through their named fiduciaries, which

had named Austin as an investment manager and/or allowed Austin to manage some or all of their plan assets, and whose assets were invested in whole or in part by Austin in any Madoff-related investment during the period February 12, 2005 through the present (the "Class"). Excluded are defendant, its officers, directors, partners, members of their immediate families, the judge and his/her immediate family, or any of their heirs, successors or assigns.

57.     The Class is so numerous that joinder of all members is impracticable.

58.     This case presents numerous common questions of law and fact, among them being:

(a)     Did Defendant owe a fiduciary duty to Plaintiffs and the Class;

(b)     Did the Defendant breach its fiduciary duties by investing and maintaining a portion of Class investments in Madoff-related investments;

(c)     Did the Defendant breach its fiduciary duty by failing to adequately investigate the soundness and suitability of Madoff-related securities before investing Class assets;

(d)     Were Class members harmed by the breaches of fiduciary duty committed by Defendant;

(e)     Are Plaintiffs and the Class entitled to equitable relief through appointment of an independent fiduciary to take control of all Defendant-controlled assets for the benefit of the Class and all participants and beneficiaries;

(f)     Are Plaintiffs and the Class entitled to equitable restitution from Defendant in order to recover lost assets, for the benefit of participants and beneficiaries, suffered as a result of Defendant's breach of fiduciary duty.

59.     Plaintiffs' claims are typical of those of the Class they represent because Plaintiffs and all of the Class members were injured and continue to be injured in the same manner by Defendant's breach of fiduciary duty.

60.     The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual Class members.

61.     Defendant has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory or equitable relief with respect to the Class as a whole.

62.     Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel who are experienced in class action and ERISA litigation. Plaintiffs have no interests adverse to or in conflict with other members of the Class.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that will preclude its maintenance as a class action.

**COUNT I**
**(Breach of Fiduciary Duty)**

64.     Plaintiffs hereby reallege and incorporate by reference the allegations of the preceding paragraphs.

65.     Section 404(a) of ERISA requires that a fiduciary to an employee benefit plan act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This and other

fiduciary duties under ERISA are among the highest known to law.

66. Defendant is a fiduciary which owed a duty of loyalty to Plaintiffs and Class members under ERISA, in that it was required to act solely and exclusively in the interests of the Fund participants and beneficiaries. As part of their fiduciary duty, Defendants owed a duty to prudently manage and invest the assets of the Plan. Defendant breached that duty by, *inter alia*,

(a) failing to sufficiently investigate the Madoff-related funds to insure that they were a safe, prudent, honest and suitable investment for employee pension benefit plans and their participants and beneficiaries;

(b) failing to locate or give sufficient attention to warning signs about the unreliability of Madoff-related funds as investment vehicles.

67. As a result of the above-described conduct, Defendant has acted in violation of Sections 404, 405 and 409 of ERISA, 29 U.S.C. §§ 1104, 1105 & 1109, to the detriment of Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant in the following manner:

A. Certification of Plaintiffs as representatives of a Class pursuant to Fed. R. Civ. P. 23(b)(1)(A) & (2);

B. A declaration that Defendant has breached its fiduciary duties to the Class in the manner described herein;

C. An order appointing an independent fiduciary to administer Defendant's investments in employee benefit funds consistent with the relief obtained by this litigation;

D. Equitable restitution to the Class to remedy the harm caused to the participants

and beneficiaries as a result of the imprudent and improper investments in Madoff-related securities;

   E.     The costs and expenses of this suit, including expenses for expert witnesses and reasonable attorneys fees; and

   F.     Such other and further relief as the Court deems just and necessary.

Dated: February 12, 2009

Robert M. Roseman
Theodore M. Lieverman
Andrew Abramowitz
Daniel J. Mirarchi
SPECTOR, ROSEMAN KODROFF
  & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300

*Attorneys for Plaintiffs and the Class*

Of counsel:

Susan A. Murray
FREEDMAN & LORRY
1601 Market Street, 2nd floor
Philadelphia, PA 19103
(215) 925-8400